DiCicco *v.* Graphic Machine Corp.

ROGER DiCICCO & others *vs.* GRAPHIC MACHINE
CORPORATION
(and a companion case[1]).

Suffolk. Middlesex. January 5, 1953. — January 29, 1953.

Present: QUA, C.J., LUMMUS, RONAN, WILKINS, & SPALDING, JJ.

*Contract*, Performance and breach, Supplementary agreement. *Words*,
"Arrangement."

Evidence warranted findings that, after the making of a contract between
a manufacturer and a buyer of machines providing that the manu-
facturer should make such machines as the buyer should order "in
accordance with the quality of material, workmanship and construc-
tion of . . . [a model] and in accordance with such plans and specifi-
cations as . . . [the buyer might] submit," for a price consisting of
the cost of labor and materials plus ten per cent thereof, but not ex-
ceeding a specified amount "unless otherwise mutually agreed upon,"
the parties, in view of substantial changes in the specifications at the
buyer's request during the manufacture of the first machines and con-
sequent increased costs, made a supplementary agreement, contem-
plated by the original contract, that for further machines then ordered
by the buyer the price should be a certain amount larger than the maxi-
mum previously fixed; and that there was no breach of the original
contract by the manufacturer in refusing to continue to manufacture
at the original maximum price.

TWO ACTIONS OF CONTRACT. Writ in the first action in
the Municipal Court of the City of Boston dated June 14,
1951; writ in the second action in the Superior Court dated
July 17, 1951.

Upon removal of the first action to the Superior Court,
the actions were heard by *Good*, J., without jury.

*Benjamin Goldman*, for Graphic Machine Corporation.

*Bernard P. Rome*, for DiCicco and others.

WILKINS, J. The plaintiffs, partners doing business as
Electro Products Company (hereinafter called Electro), sue

---

[1] The companion case is by the defendant in the first case against the
plaintiffs in the first case.

for the price of three collating machines, which Electro manufactured, sold, and delivered to the defendant Graphic Machine Corporation (hereinafter called Graphic). There is a cross action by Graphic in two counts, the first for breach of a written agreement to manufacture machines, and the second for money had and received and based on charges allegedly in excess of those permitted by that agreement. The judge found for Electro in both cases. Graphic excepted to the denial of some of its requests for rulings, to the granting of certain requests of Electro, and to the finding for Electro in each case.

The question whether the evidence in an action at law warrants a general finding made by a judge on conflicting oral testimony is not raised by an exception to that finding. *Sreda* v. *Kessel*, 310 Mass. 588, 589. *Matter of Loeb*, 315 Mass. 191, 194. *Robinson* v. *Trustees of New York, New Haven & Hartford Railroad*, 318 Mass. 121, 134. *Barton* v. *Cambridge*, 318 Mass. 420, 423–424. The exceptions to the findings must be overruled. Nothing turns on this here, however, as the rulings on the requests present the issues.

The function of a collating machine, which is about the size of a standard desk, is to deposit small dots of glue on separate sheets of paper, thereby facilitating the production of custom made business forms. Electro, which builds machine parts and assemblies, began making the "Paddy carbon interleaving machine," concerned in these cases, in the spring of 1949. One Herbits, president of Graphic, which held a patent on a collating machine, went to Roger DiCicco, one of three brothers constituting the partnership known as Electro, to have a machine built. He told Roger where a sample machine might be seen. Roger looked it over and copied down its specifications.

On July 26, 1949, after Electro had produced one machine, Electro and Graphic entered into a written contract whereby Graphic granted to Electro an exclusive license to manufacture for Graphic machines covered by the patent. Electro was to manufacture "in accordance with the quality of material, workmanship and construction of the model Paddy

Machine just completed by Electro, and in accordance with such plans and specifications as Graphic may submit to Electro, from time to time, upon the written orders of Graphic, all such Paddy Machines and parts thereof as Graphic may need to enable it to meet the demands of its business." Other provisions were: "Orders for Paddy Machines shall be in multiples of 10 or more . . ." (paragraph 3). "Graphic shall pay to Electro, for each Paddy Machine ordered under the provisions of this agreement, a sum equivalent to the proper hourly labor charge and the net cost to Electro of the raw or fabricated materials and parts, expended or used . . . plus 10% of the total of the labor charge and cost of materials as herein set forth. The total of said labor charge and cost of materials and plus the 10% as herein set forth shall in no event exceed the sum of $700 unless otherwise mutually agreed upon between Graphic and Electro in writing" (paragraph 4).

By July, 1950, Electro had produced 30 machines under the contract upon order of Graphic. These were in two lots, the first of 10 and the second of 20. During the course of their production many changes in specifications were made at Graphic's request. On July 13, 1950, there was a conversation about costs, at which were present Herbits, Roger, the plaintiff Tripoli DiCicco, and one Pratt, the treasurer of New England Duplicating Co., Inc., a distributor for Graphic. The DiCiccos brought out the fact that the many changes had added appreciably to the costs, and that "it would be necessary to review the cost of this machine" if the new machine, rather than the original machine, was to be built. Herbits and Pratt stated that they wanted the new machine. Roger said that the new machine would cost $1,248.20, and that Electro would build a minimum of 10 units. Herbits said that Graphic would pay $1,248.20 for 15 machines. This conversation was purportedly confirmed in a letter of July 17, 1950, from Electro to Graphic, asking for a written acceptance on "a minimum quantity of ten units" and a deposit of $100 on each machine ordered. On July 25, 1950, Graphic wrote Electro as

follows: "We are enclosing herewith our check in the amount of $1,500 as a deposit on the building and completion of fifteen additional machines in accordance with our previous agreements. In this instance we are willing to increase the price to you to $1,248.20. This in no way effects [*sic*] the agreement between us now in existence." Electro thereupon built and delivered the 15 machines, but Graphic paid for only 12 of them.

There was evidence from which the judge would have been warranted in finding the foregoing facts. It cannot be soundly contended that the evidence as a whole required a finding for Graphic in each case, and Graphic's requests for rulings to that effect were rightly denied. In the action by Electro the judge could have found that there was a simple situation of goods sold and delivered and not paid for. In the action by Graphic he could have found that there was no breach of contract.

In an extensive brief Graphic seems to ignore altogether the effect of the provision in the written contract which qualifies the $700 limit on price: "The total . . . cost . . . shall in no event exceed the sum of $700 unless otherwise mutually agreed upon between Graphic and Electro in writing." The letters of July 17 and 25, 1950, if not constituting, as matter of law, such a mutual agreement, at least could have been found to be one. This is in effect what the judge did. He made no general statement of his findings. But his action upon requests and his findings made in ruling upon some of them show this to be the view he took of these cases. He granted Electro's fourth request,[1] which read: "If the agreement between the parties dated July 26, 1949, provides that 'The total of said labor charge and cost of materials and plus the 10% as herein set forth shall in no event exceed the sum of $700 unless otherwise mutually agreed upon between Graphic and Electro in writing,' then an agreement in writing subsequently thereto between the parties calling for a price in excess of

---

[1] The requests hereinafter referred to by number are in the case in which Graphic is plaintiff.

$700 is an agreement supplementary to the original contract contemplated thereunder and not in breach of the said original contract." In denying Graphic's eleventh request, which was, "Upon all the evidence, the contract with respect to the last 15 machines was severable from the main agreement of July 26, 1949," he found, "It was an entirely new arrangement." "Arrangement" is a vague word. See *Beckford* v. *Beckford, ante,* 389, 390. We interpret this finding to mean that the parties' agreement leading to the manufacture of the last 15 machines was under paragraph 4 of the original contract of July 26, 1949.

Graphic contends that Electro repudiated the original contract by refusing to manufacture machines at $700 each. But the judge was not obliged to make such a finding. The judge could have accepted Roger's testimony that Electro was willing to build in accordance with the original model at $700 each. Graphic takes the position that, no matter what changes had been made in the machine and no matter what the increased cost of manufacture, Electro had to make the revised machine for $700. Such a contention cannot be accepted. To do so upon evidence upon which Graphic relies in this respect, such as the form of the invoices for the first 30 machines, or additional amortization payments made on the second 20 machines, would be tantamount to making the unusual ruling that there was waiver as matter of law. *MacDonald & Payne Machine Co. Inc.* v. *Metallic Arts of New England, Inc.* 324 Mass. 353, 356. Nor is this a situation where the parties placed a construction upon an ambiguous contract, as in *Atwood* v. *Boston,* 310 Mass. 70.

What has been said disposes of many of the questions argued. In this category are Graphic's requests 7 and 8,[1] which were denied with the addition "Facts not so found,"

[1] 7. "If the defendants refused to go on with the manufacture of the machine without any legal excuse, then they repudiated the contract." 8. "The plaintiff is excused from tendering written orders, and the deposits, for more machines, if the defendants definitely refused to manufacture them for the plaintiff for less than $1,248.20. (This request applies to the machines other than the first 45)."

and Graphic's requests 11, 16 to 19, inclusive,[1] and Electro's third request.[2] In *Carrig* v. *Gilbert-Varker Corp.* 314 Mass. 351, there was a repudiation by the builder. Here the judge could find that there was no repudiation by Electro.

Graphic's fourteenth request was, "If the plaintiff paid the additional amount for the last 15 machines under compulsion, then the plaintiff is entitled to recover the excess." The fifteenth request was, "Upon all the evidence the plaintiff's payment of the excess was the result of 'duress of goods.'" Both requests were denied with the statement, "Facts not so found." There was no error. The case of *Murphy* v. *Brilliant Co.* 323 Mass. 526, on which Graphic relies, is quite distinguishable. There the defendant could have been found to have threatened an unlawful detention of the plaintiff's boat unless more than the agreed price for repairs was paid. Here nothing was withheld; and the contract contemplated a change in price by mutual agreement, which could be found to have been made. Graphic lays great store by the final sentence of its letter of July 25, 1950, in substance to the effect that the payment of $1,248.20 each for 15 machines did not affect "the agreement between us now in existence." The argument goes to the extent of claiming that at the same time Graphic was promising to pay $1,248.20 for a machine an unequivocal term of its promise was that it would sue to recover back all in excess of $700, and that this term was accepted by Electro. We are not surprised that the judge was not impressed by this contention. There were more reasonable explanations of the arrangement open on the evidence. As we have herein-

---

[1] 16. "Upon all the evidence the defendants renounced the agreement of July 26, 1949." 17. "Upon all the evidence the fact that the first 30 machines differed from the original model made by Electro does not give the defendants a legal right to refuse to make further machines like the said 30 for $700 each." 18. "Upon all the evidence the plaintiff had the right to insist that the defendants make further machines (after the 45) like the said 30 or the said 15 at $700 each." 19. "In that regard the agreement of July 26, 1949, still controls."

[2] 3. "If the machine that was referred to in the letters of July 17 and July 25, 1950, differed materially from the model machine referred to in the contract of July 26, 1949, then there was consideration to support the contract of July 25, 1950."

before discussed, he must have found in accordance with one of them.

. Graphic argues that it was induced to pay $1,248.20 by fraud of Electro, which represented this sum to be the cost, and that there is evidence the cost was $1,193. It is not clear to what requests this argument is intended to apply. Indeed, we are not sure that this question was raised in the court below. There is no suggestion of fraud in the pleadings. There was, of course, no such finding. Fraud is never presumed. *Kerrigan* v. *Fortunato*, 304 Mass. 617, 620. The judge, to say the very least, was not required to find that the cost was intentionally misrepresented.

The other requests of Graphic which were denied, and which relate to damages or to pleading or to burden of proof, do not merit discussion.

The judge allowed Electro's requests 5, 6, and 7.[1] With respect to the fifth request, the judge did not have to believe that Graphic gave oral orders, and his treatment of the various requests does not show that he found that such orders were given or that the contractual provision for written orders was waived. Contrary to Graphic's contention, the fifth request does not amount to an agreement by Electro that there was a refusal to manufacture. As to the sixth request, the judge did not decide for Electro in the action by Graphic on the ground that it was a breach of the original agreement to order 15 machines. On his findings, there was an agreement supplementary to the original contract and contemplated by it which was broken by Graphic's failure to pay for 3 machines. The granting of Electro's seventh

---

[1] 5. "If the agreement of July 26, 1949, provides that 'Electro manufacture . . . upon the *written* orders of Graphic, all such Paddy Machines and parts thereof as Graphic may need to enable it to meet the demands of its business,' then the defendant cannot be said to have breached the said agreement on the grounds of refusal to manufacture additional machines unless it is shown that the order for the additional machines was in writing." 6. "If the contract of July 26, 1949, provides that orders for Paddy Machines shall be 'in multiples of 10 or more,' then an order for 15 machines is not one given in accordance with the terms of the original contract but is in breach thereof." 7. "If the defendant manufactured and delivered machines in accordance with its contract and was not paid therefor by the plaintiff, then such a failure to make payment was a material breach of contract which would excuse the defendant from further performance of the said contract."

request was not inconsistent with the denial of Graphic's eleventh request, but was a correct ruling consistent with his findings.

*Exceptions overruled.*